AO 106 (Rev. 01/09) Application for a Search Warrant

**FILED**
At Albuquerque NM

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

JUN 0 8 2009

MATTHEW J. DYKMAN
CLERK

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| | ) |
| #1021 Old Santa Fe Trail | ) |
| Santa Fe, New Mexico | ) |

Case No. 09-MR-199

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____ District of ___**New Mexico**___ *(identify the person or describe property to be searched and give its location)*:

### See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of ___**18**___ U.S.C. § ___**1170**___ , and the application is based on these facts:

### See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**Noel D. Wagner, Special Agent**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **08 June 09**

_____
*Judge's signature*

City and state: **Albuquerque, New Mexico**

GC Idraelis, AUSA
June 8, 2009

**RICHARD L. PUGLISI**
*Printed name and title*
**U.S. MAGISTRATE JUDGE**

# AFFIDAVIT

## I. INTRODUCTION

1.  I, Noel D. Wagner, being duly sworn, hereby do depose and state that this affidavit is prepared in support of a warrant to search the premises of Forrest Fenn at # 1021 Old Santa Fe Trail Santa Fe, New Mexico, as further described in exhibits A and B attached hereto.

2.  I am a Special Agent (SA) with the United States Department of the Interior, Bureau of Land Management (USDOI/BLM), Office of Law Enforcement and Security (OLES) and have been so employed since January 2001. Prior to working as an SA, I was employed as a BLM Law Enforcement Ranger for approximately three years and a United States Park Police Officer for approximately five years. With over fifteen years experience as a federal law enforcement officer within the Department of Interior, I have investigated numerous crimes relating to the theft, trafficking and destruction of natural and cultural resources.

3.  I have successfully completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center (FLETC), and I have also graduated form the Basic Police and US Park Police Specialized Programs at FLETC. Prior to my federal service I successfully completed the 700 hundred hour, Florida State Peace Officer Standards and Training Program. I have a Bachelor of Arts degree in the Administration of Justice program from the University of Pittsburgh. I have also completed numerous specialized training programs, regarding the Archeological Resource Protection Act (ARPA) and Native American Graves Repatriation Act

1

(NAGPRA), and I have directly or indirectly been involved with numerous criminal investigations concerning both of theses laws.

4. In addition to my training and experience as a federal law enforcement officer, I have personally been involved in obtaining federal search and arrest warrants, and I have directed, coordinated and assisted other law enforcement officers in numerous executions of these warrants.

## II.   AGENT'S KNOWLEDGE CONCERNING RECORDS AND INVENTORIES OF ARTIFACT COLLECTORS AND DEALERS

5. During my experience in these type of investigations, I have discovered that it is customary for individuals interested in and/or involved in the collection of artifacts protected under ARPA and NAGPRA to maintain records, documents (written and electronic), inventories, receipts, letters, field notes, electronic mail, sketches, ledgers, photographs, and video tapes of artifacts that they found, collected, traded or sold, in addition to hand-drawn diagrams, topographic, official land status or other maps pertaining to the searching, selling, collecting, and excavations of said artifacts. This documentation may also include bank records which may show large, unusual or unexplained deposits of money as a result of the sale of these artifacts.

6. One of the reasons these individuals keep these records is that they can charge a greater price for illegal artifacts if they present the buyer with records of when and/or where and/or by whom the artifact was found.  This information also makes these artifacts more desirable to

pre-historic Native American artifact collectors.  I also know that these individuals usually keep these records indefinitely.

7.  Further, these records will usually include maps that document the sites where they have looked for or found protected artifacts. Individuals engaged in this type of activity will also use Global Positioning Satellite (GPS) technology to document and electronically map locations of archaeological sites or areas where these individuals have searched for artifacts.

## III.   AGENT'S KNOWLEDGE OF COMPUTERS AS USED BY ARTIFACT COLLECTORS AND DEALERS

8.  I also know through experience and through information provided by other law enforcement officers, that computer hardware, computer software, and electronic files may be important to criminal investigations concerning cultural and natural resource crimes. These items are both used as storage devices and instrumentalities of the crimes in that they contain contraband, evidence, or fruits of a crime in the form of electronic data. In this case the warrant application requests permission to search and seize records and information, as they relate to cultural and natural resource violations, including those records and information that may be stored on a computer.  This affidavit also requests permission to seize the computer hardware that may contain the records and information if it becomes necessary for reasons of practicality to remove the hardware and conduct a search off-site.  I believe, in this case, the computer hardware is a container for evidence, and also itself an instrumentality of the crimes under investigation.

9.  For the purposes of this affidavit, unless otherwise specifically indicated, the term "computer" refers to the box that houses the central processing unit (CPU), along with any storage devices (such as internal hard drives) and internal communications devices (such as internal modems capable of sending/receiving electronic mail or FAX cards) along with any other hardware stored or housed internally.  Thus, "computer" refers to hardware, software and data contained in the main unit.  Printers, external modems (attached by cable to the main unit), monitors, and other external attachments will be referred to collectively as peripherals and discussed individually when appropriate. When the computer and all peripherals are referred to as one package, the term computer system includes both software applications and data.

10. The term "computer hardware" as used in this affidavit refers to all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data.  Hardware includes, but is not limited to, any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices; peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communication devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices; as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

11. The term "computer software" as used in this affidavit refers to digital information, which can be interpreted by a computer and any of its related components to direct the way they work.  Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (such as word processing, graphics or spreadsheet programs), utilities, compilers, interpreters, and communication programs.

12. In subsequent investigation on the World Wide Web (www), I discovered that Forrest Fenn and his collections were associated with a virtual storefront (www.oldsantafetradingco.com) registered as the "Old Santa Fe Trading Co." This site sells "…Indian artifacts" which encompass "…arrowheads…pottery… (and) other artifacts." In one section of the site, a knife and sheath from the "…1860s" was listed for "…$950.00", and the site noted; "…we are offering these items from the private collection of Forrest Fenn."

13. Except where otherwise stated, the information set forth herein is based upon my personal knowledge and observations, and I reasonably rely upon, the information identified in this affidavit and application. This information is of the quality and quantity routinely and properly relied on by law enforcement personnel in conducting investigations and analyzing the existence of probable cause to believe crimes, such as those being investigated in this matter, are being or have been committed.

## IV.   IDENTIFIABLE CRIMES

14. Based on my experience, education, and training as a law enforcement officer and in consultation with other Federal officers who are experienced in these types of investigations and the aforementioned facts set forth herein, I reasonably believe that there is probable cause to believe a crime has been committed, and the pertinent regulations relating to these crimes are summarized below for the convenience of the court:

a.      Title 18 USC § 641 provides in pertinent part that whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any thing of value of the United States or any department or agency thereof, shall be fined or imprisoned for not more than 10 years, or both.

b.      Title 18 USC § 1170 (b) provides in pertinent part that whoever knowingly sells, or uses for profit any Native American cultural items obtained in violation of the Native American Graves Protection and Repatriation Act (NAGPRA), shall be fined and imprisoned not more than one year, or both. In the case of a second or subsequent violation, the person shall be fined and imprisoned not more than five years, or both.

c.      Title 16 USC § 668(a) provides in pertinent part that whoever without being permitted to do so, shall knowingly possess, sell, barter or offer to sell at any time or in any manner any bald eagle, or any golden eagle, or any part thereof of the foregoing eagles, shall be fined or imprisoned for not more than one year, or both.

d.      Title 16 USC § 703 provides in pertinent part that it shall be unlawful at any time to possess or offer to sale, any migratory bird or part of any such bird, included in the terms to the conventions between the United States and other governments. Whoever, knowingly offers to sale or barter any such migratory bird shall be fined not more than $2,000 or imprisoned not more than two years or both.

e.      Title 18 USC § 2315 provides in pertinent part that it shall be unlawful to receive, possess, store any goods, wares, or merchandise of the value of $5,000.00 or more, which have crossed a State or United States boundary after being stolen, unlawfully converted or taken, knowing the same to be stolen, unlawfully converted or taken.

15. I  also reasonably believe that the property to be seized as set forth in Attachment B is contraband, evidence, fruits and instrumentalities of a crime, and that there is probable cause to believe that the property to be searched for and seized will be found within the premises as described in Attachment A for reasons including the following:

## V.     STATEMENT OF FACTS

16. The Federal Bureau of Investigation (FBI) and the BLM, in Salt Lake City (SLC), Utah have developed a significant Source of Information (SOI) (identified hereafter as SU 6129) who has been a major dealer of archaeological artifacts over the past ten years, and is in a position to testify.  SU 6129 has an extensive number of contacts who actively deal in archaeological material to include excavators, dealers, and collectors of stolen and illegally obtained artifacts.

17. This joint FBI and BLM investigation was initiated on November 30th, 2006, via an application for undercover authority, and was based largely on the development of SU 6129 in October 2006, due to a chronic problem of ARPRA and NAGPRA violations in the Intermountain West/Four Corners area (intersection of Utah, Colorado, New Mexico, and Arizona) of the United States. Through the aforementioned contacts in the Santa Fe area, the name of Forrest Fenn was given as someone who had a large amount of perishable artifacts and was willing to sell or trade artifacts. SU 6129 was subsequently introduced to Fenn by another investigation suspect in the Santa Fe area.

A. **Introduction of Source to Fenn, by Schenck**

18. On August 16th, 2008, a consensually monitored and recorded conversation occurred between Forrest Fenn, Bill Schenck and SU 6129. This meeting was monitored by the case agents in real time via a transmitter worn by SU 6129 during the meet.

19. On the above date, SU 6129 met Schenck at the White Hawk artifact show in Santa Fe, New Mexico. SU 6129 joined Schenck in his vehicle and was driven to the Forrest Fenn residence. Schenck subsequently arrived at a location that he described as having a street address of "…1021." Schenck then spoke into an intercom system at the residence and stated: "Hi Forrest, it's Billy." This location was later confirmed by SU 6129, physical agent corroboration and open query search systems as the residence of Forrest Fenn, located at #1021 Old Santa Fe Trail, Santa Fe, New Mexico.

20. At this point, SU 6129 and Schenck were invited into the residence by Fenn and he (Fenn) then asked SU 6129 if he/she was "...interested in prehistoric things." Fenn then directed SU 6129 and Schenck through the first hallway to the left, then into the second doorway on the left which emptied into the garage. From here, Fenn walked into the first door on his left which was surrounded by animal skulls.

21. Upon entering into this room, later identified by Fenn as his lab, the video captured a room filled with numerous and varied artifacts. SU 6129 explained it's fascination with perishables to which Fenn replied; "I like perishables too. Cave material." Fenn went on to state that one has "...to be careful buying it (perishables) today, don't ya?" Fenn then joked that "...if you're careful buying it, you don't have to be careful selling it, the guy buying it has to be careful."

22. Fenn then went on to explain his excavation at San Lazaro and how he had dug a kiva within the site, dubbed "...Kiva B." San Lazaro Ruin is the private deeded property of Fenn, located in the Galisteo Basin. Fenn then went on to display and describe many of the artifacts to SU 6129 which included beads, axe heads, animal remnants, human effigy sherds, and arrowheads. A map was also recorded, via SU 6129's recorder, which was displayed on a wall in the room, which diagramed the San Lazaro Ruin, along with numerous other items of records and documentation, produced by Fenn. Fenn went on to explain that the majority of the artifacts in this room were excavated from the San Lazaro property. It should also be noted here that any artifact from the San Lazaro Ruin would be considered the legal property of Fenn.

B. **Fenn's background as a collector of artifacts and Native American cultural items, and descriptions of his collections**

23. At this point, Fenn directed SU 6129 and Schenck to his "...office" where he asked SU 6129, "What do you have, perishable, for sale?" SU 6129 asked what he was interested in to which Fenn replied; "Atlatls." An atlatl is a prehistoric throwing device and an intact example of the artifact is considered to be extremely rare. SU 6129 explained that a colleague was in possession of an atlatl that was from Nine Mile Canyon. As they spoke SU 6129 recorded via video recorder numerous feathered head dresses along the wall of Fenn's office. Fenn then remarked that he had "...other perishable material in my vault" and invited both SU 6129 and Schenck to view his inventory. A subsequent review of the video by U.S. Fish and Wildlife agents confirmed that it was highly likely that the headdresses in Fenn's possession were made of bald and/or golden eagle feathers.

24. Before going into the vault Fenn stated that he was interested in purchasing the atlatl and a perishable necklace made of juniper berries, from SU 6129. Inside the vault, SU 6129's video camera recorded numerous perishable artifacts along with numerous other pre-historic items. Fenn then identified three artifacts that he "...found" and described one piece as possibly one of the "...first American necklaces...Basket Maker I...300 B.C." Fenn told SU 6129 that he had "...found this (the necklace) in Arizona." Fenn went on to describe artifacts in the vault as items he found in Arizona. At no time during their conversation did Fenn state that any of the items in the vault had come from San Lazaro Pueblo.

25. Fenn then went back into his office to show SU 6129 some other arrows he described as Spanish arrows. Fenn retrieved other items from the same corner of the office, which included knives and sheathes. SU 6129 then accompanied Fenn back into the safe, and Fenn began to display and describe more artifacts. Fenn stated, "All this stuff I found myself." Fenn pulled out a glass mount of artifacts that he described as "…cave material" containing "…human hair." Fenn also displayed (arrowhead) points "…picked up at adobe wall" and pieces of chain mail found at "…Pecos church." Pecos church can describe a cultural ruin located within the Pecos National Historic Park, administered by the National Park Service (NPS) near Pecos, New Mexico. The NPS took control of the pueblo, church and surrounding area in 1965. Prior to 1965 it was held as state property.

26. Fenn then displayed a glass mount of "…my bolt heads." When asked if the mount of bolt heads was from San Lazaro, Fenn stated that the only bolt head from Lazaro was in his other room (lab) and that the bolt heads in the vault "…were from other places." Fenn went on to describe other pieces in the safe as "…stuff I picked at different places…caves…whatever." Fenn told SU 6129 he used to sell to buy artifacts, but only purchased things that struck his interest now. Fenn also reiterated that he would be interested in buying the atlatl previously spoken of and would consider purchasing even more.

C. **Fenn describes an artifact that he removed from a Native American salt mine, believed to be located on public lands**

27. Fenn then showed SU 6129 a "...stone axe haft" that he had found "...myself." Fenn explained that the he had removed the artifact after it was discovered with the remains of a Native American near a "...prehistoric salt mine near Camp Verde Arizona." Fenn explained that the Native American had apparently been trapped in the mine underneath a large boulder of salt.

28. A subsequent investigation by Arizona State Office (AZSO) BLM concerning the salt mine revealed that the mine was a significant prehistoric and historic cultural site. AZSO agents learned form a USFS archeologist that the mine was a specific archeologically-recorded prehistoric salt mine, used by Native Americans throughout present day Camp Verde, AZ. The USFS archeologist also confirmed that the salt mine is located on public lands, administered by the USFS and has been in the public domain since 1919. Further, USFS archeology personnel confirmed that there were no other similar archeological sites within a 50 mile radius.

29. Also, an archeological report by USFS archeology personnel indicated that this salt mine was known to have been mined by prehistoric people from AD 1300 to about AD 1450. Following prehistoric use, the Hopi, Yavapai and Apache tribes gathered salt as well. This same USFS report also indicated that this salt mine was a very important resource for the prehistoric inhabitants of the southwest and that salt trails were sometimes followed for long distances, to a salt source. The report goes on to indicate that the Camp Verde salt mine was the only underground salt source that was actually mined by Native Americans in Arizona and that two mummified individuals were discovered and were

believed to have died in a prehistoric cave-in. Other artifacts discovered by legitimate excavations revealed stone picks, axe handles, and pick hafts, similar to the haft as described by FENN.

30. Fenn also pointed out a "...tumpline" and stated that he "...found that in a cave in Arizona." According to government archeology personnel, a tumpline is a strap attached at both ends to a backpack or other luggage and used to carry the object by placing the strap over the top of the head. Tumplines were used by prehistoric and historic Native Americans.  Fenn then told SU 6129 that he would be interested in trading artifacts as long as they didn't deal with pieces that "...I found."

31. SU 6129 and Fenn then left the vault and sat in his office and discussed various artifact collections. During the conversation, Fenn displayed a vast amount of knowledge about artifacts and collectors within the community. As SU 6129 and Schenck were preparing to leave, Fenn pointed out a piece of Spanish horse armor in his office. Fenn read the provenience information associated with the piece and identified the artifact as having been removed from "...a rock shelter in the Guadalupe Mountains near El Paso Texas...1926...by Maria Golar (spelling?)." A subsequent debrief of SU 6129 also confirmed that there was a computer with a CPU located within Fenn's office. SU 6129 and Schenck then left Fenn's residence and drove back to the White Hawk antiquities show.

32. During the drive, Schenck spoke about Fenn and his past "...digging", stating;  "He started out his (Fenn's) prehistoric pottery career, digging on days off when he was

13

stationed out at  Williams Air Force Base, which is on the west side of Phoenix, so he

was a Hohokam digger back in the middle sixties." According to BLM archeology staff,

Hohokam is a term used by archaeologists to describe a prehistoric cultural tradition in

the Southwest, particularly in the Salt and Gila River valleys of Arizona. This tradition is

marked by extensive irrigation canals, ball courts, and artifacts that show a

Mesoamerican influence. The Hohokam culture lasted from approximately AD 1 to AD

1450. Schenck went on to explain that Fenn then started a gallery in Santa Fe after he was

discharged from the Air Force. SU 6129 then left Schenck at the show, and ended the

monitoring.

D. Second meeting with Fenn by the Source and Fenn's description of a Native
   American basket that he likely removed from public lands

33. On October 1st, 2008 another consensually monitored and recorded conversation

occurred between Forrest Fenn, Bill Schenck and SU 6129. This meeting was monitored

by the case agents in real time, via a transmitter, worn by SU 6129 during the meet.

34. On the above date, at approximately 1640 hours, SU 6129 met with Bill Schenck at his

place of residence. They then went to the residence of Fenn and were invited into the

house by Fenn. Fenn immediately asked if SU 6129 was in possession of an atlatl. SU

6129 explained that he/she didn't have the atlatal at the time, but had brought some other

items that Fenn would be interested in. SU 6129 then brought out several perishable

items for Fenn to examine, to include prehistoric sandals and a woven bowl. As Fenn

examined the pieces, he stated that he used to be in possession of "...some great sandals...I should have kept some of them."

35. Fenn then examined photographs of the atlatl as shown by SU 6129 and stated that he would be interested in trading for the piece.  Fenn then took SU 6129 back into his vault to look at items Fenn might be willing to barter with.  Fenn then displayed more items in the vault to SU 6129 and began to explain how he had acquired them. Fenn spoke of one basket in particular that he "...found...out of northern Arizona...out of a cave." At this point the video recorded a large woven basket. Fenn went on to describe how the "...Pueblo III (prehistoric)" basket had been removed from a "...cliff dwelling" with "...vigas on the top of this cliff dwelling" and that carved on the vigas there was a "...white man's name...and the date...1860 or something." Fenn went on to explain that he would "...find these things (ruins) from the air, and then on the weekends we'd go in there...I had an old army jeep." Fenn went on, "...we found so many caves that evidently nobody had been in since the Indians had been there...Clear Creek...Beaver Creek."

36. Clear Creek and Beaver Creek have subsequently been identified as large drainages in northern Arizona, which match Fenn's descriptions. Subsequent interviews by AZSO agents with USFS archeology personnel indicated that there were approximately 15 archeological sites within the Clear Creek and Beaver Creek drainages matching Fenn's descriptions and that these archeological sites were cliff dwelling structures located within the Coconino National Forest. After examination of 2 specific archeological

reports, documenting 2 specific dwellings in the Beaver and Clear creek drainages, agents discovered site photos associated with these records. Examination of theses archeological file photos revealed that of one of the structures contained large beams which had several illegible markings on their surface.  These two dwelling locations were identified as being located on public lands administered by the USFS and had been in the public domain since 1903. Further, the other archeological structures in the Clear and Beaver Creek areas matching Fenn's descriptions were also determined to be on public lands, which make up approximately 90% of the area.

37. Fenn continued to identify artifacts throughout the vault that he had "…found" and again reiterated that the Spanish bolt head collection in his possession was "…two-thirds of all (bolt heads) that are known." Fenn also explained that due to his experiences in caves he had contracted "…valley fever" and that he didn't go into "…those caves anymore."

### E. Fenn describes his collection of Native American sun dance skulls and their sacred relationship with the tribes

38. Fenn then identified an animal skull as a "…bison antiquus…probably ten thousand years old" and that it had been used in a "…sun dance…after (the) 1800s." Fenn also indicated that it was from a "…northern plains" Native-American tribe. Fenn went on to point out many other skulls in his office that he identified as "…all sun dance skulls" and stated that he obtained them from a friend who traded new skulls for the painted ones.

39. The "...sun dance "described by Fenn is noted by anthropologists and Native American elders as a significant religious ceremony. According to officials of the Smithsonian National Museum of Natural History, the museum's repatriation department had identified a similar skull within their collections. Following a consultation visit from the Southern Cheyenne in 1997, this buffalo skull was removed from exhibit because the tribal representatives considered it inappropriate for public viewing. They recognized it as a ceremonial and sacred object which the representatives believe is still alive with power.

40. In subsequent consultation with a Cheyenne Sundance priest, it was revealed that these skulls were considered to be sacred objects used in sensitive tribal ceremonies. This priest was shown photographs of the skulls as recorded in the Fenn residence and he confirmed that these could be original sun dance skulls as used in the sun dance ceremony or fasting ceremonies. The priest explained that the skulls were intended for re-use and were supposed to be kept safe by a "...keeper" and belonged to the tribe "...as a whole"

F. **Fenn describes his collection of headdresses and particularly relates his purchase of one headdress in 1948**

41. Fenn was then asked about his collection of head dresses and how he was able to own items with "...eagle feathers." Fenn stated that "...the law says you can own and transport them...you just can't buy them and sell them, and these are all pictured in my book so they're grandfathered in...my book is 15 years old...but these (headdresses) are

all legal anyways." Fenn then particularly described "...this third bonnet here" and pointed to the third headdress from left hanging on his wall and told how he acquired it. Fenn stated that he had "...bought (the headdress) from a lady...on Lake Pond d' Oreille ...an old Indian woman" and that he had paid one-hundred dollars for the piece. Fenn stated that he purchased the headdress when he was "...18 (years old)" in "...1948...one year before the law was passed." An open source query of Forrest Fenn corroborates his date of birth as August of 1930.

42. It should be noted here that the Bald Eagle Act was enacted in 1940 and, per consolation with USFWS agents, its language protects both the bald and golden eagle species (Golden per amendment in 1962). A subsequent review of the video recording the aforementioned headdress by USFWS agents indicated that it was extremely likely the feathers adoring the headdress were those of the bald and/or golden eagle species. The aforementioned Cheyenne priest also reviewed photographs of the video recording and confirmed that bald and golden eagle feathers were consistent with the feathers used in the manufacture of headdress like the one identified by Fenn.

43. Fenn then explained that the law also applied to kachina dolls with eagle feathers and stated that the reason dealers pull off the feathers is because "...they (dealers) want to sell them...can't sell them with the feathers on them." Fenn stated that "...the law (Bald Eagle Act) is ruining the cultures" and that all of his headdresses were "...inherited" except for the headdress identified as being purchased "...pre act" and another Fenn claimed he had been given. Fenn went on to say that "...you don't have to prove

anything, just keep your mouth closed...they've (law enforcement) got to prove you

obtained it illegally, and I've never bought or sold anything that was illegal."

G. **Fenn describes his collection of Kachina masks and their sacred relationship with the tribes**

44. Fenn then began to speak about the ceremonial "...masks" in his office. Fenn stated that

they were "...Hopi" and that he used to "...sell a lot of those things; they get goosy

anymore if you do that...I've had these things for 25 years." Fenn went on to describe

one mask in particular, that he pointed out in a high corner of his office, as "...my best

one...Rio Grande Pueblo." The masks recorded by the video in the Fenn residence were

typical of Hopi kachina masks as used in Hopi ceremonies. According to Hopi Cultural

Preservation Office personnel, who reviewed images of the masks, it was learned that

these masks were consistent with ceremonial kachina masks as used by the tribe and were

very likely authentic. Further, the HCPO Director indicted that theses masks represented

scared objects to the Hopi tribe and were considered inalienable due to their status as

items of cultural patrimony.

45. Fenn explained that the masks in his office had at one time been hanging in his gallery.

During this time, Fenn stated that federal officers and Native-American elders came to

the gallery and wanted to "...take these Hopi masks", but Fenn refused and demanded

court orders from the group. Fenn stated that he "...never heard from them again."

46. It should also be noted that a subsequent query of the national NAGPRA database

revealed that there were at least 3 separate federal notices, repatriating similar Hopi

Kachina masks that were determined to be sacred objects needed by traditional Native American religious leaders for the practice of traditional Native American religions by their present day adherents. It was further determined that these repatriated masks held a relationship of shared group identity that can be reasonably traced between the sacred objects and the Hopi tribe of Arizona.

### H. Fenn describes his mummified falcon, removed from the Cairo Museum

47. Fenn then directed SU 6129 back into his office where they discussed several other pieces throughout the room. When asked about a specific "…Egyptian…falcon mummy" piece which contained the remains of a raptor and how he was able to possess it, Fenn stated, "There's nothing illegal about Egyptian things." Fenn went on to explain that this particular artifact had been given by "…President (Anwar) Sadat to a lady who worked for Harold Brown when he was Secretary of the Air Force (1965-1969)…that (falcon mummy) came out of Tut's (Tutankhanum) tomb…He (Sadat) was famous for taking things out of the Cairo Museum and giving them to dignitaries…I have a letter from the Egyptian Embassy in Washington asking for that thing back…they know I have it." Fenn then displayed what appeared to be an x-ray photograph of the bird contained within the small sarcophagus.

### I. Fenn's trade of a sacred dance mask to the source

48. On October 29th, 2008, another consensually monitored and recorded conversation occurred between Forrest Fenn and SU 6129. This meeting was monitored by the case agents in real time via a transmitter worn by the SU 6129 during the meet.

49. At approximately 1000 hours SU 6129 arrived at the residence of Fenn at # 1021 Old Santa Fe Trail, Santa Fe, New Mexico. This meeting had been arranged by Fenn for the purposes of trading artifacts. Upon arrival SU 6129 was invited into the residence by Fenn, and SU 6129 brought out the atlatl for Fenn's inspection. This particular atlatl has a legal provenience, as researched by Utah BLM OLES staff, and was provided by Dace Hyatt for the potential trade. SU 6129 provided documentation for Fenn concerning the atlatl and explained that it had been removed from Rasmussen Cave on private land.

50. After examining the atlatl, Fenn asked; "What do I have I can trade you for this?" SU 6129 explained that he wished to trade for a mask, "…a kachina mask." Fenn continued to examine the atlatl and explained that he didn't "…question the authenticity of it," but explained that that the only way true provenience could be proven was to "…be there (at removal)." SU 6129 again explained the provenience of the atlatl and the background of Dace Hyatt. Fenn then stated; "I like it (the atlatl), O.K." When SU 6129 again expressed that he/she wanted to trade for a kachina mask, Fenn stated that he really didn't want to trade one of his masks, as he had had them "…over 30 years." Fenn then stated that it wasn't "…in my best interest to do that (trade)."

51. Fenn then directed SU 6129 to the garage where he pointed out a "…Pueblo dance mask…it's heavy…but it's worn on the head." Fenn then pointed out what appeared to be a dried buffalo skull with painted designs on the horns. SU 6129's monitoring equipment also recorded that the piece had a leather band on the bottom of the skull, apparently for the purpose of attachment to a human's head. When asked if it was a kachina figure, Fenn replied, "Yeah." Fenn then explained that the piece "…came out of Taos (pueblo)." When asked what kachina the cultural item represented, Fenn replied, "Well it would have to be buffalo dance."

52. Fenn continued to explain how the item was worn on the head. Fenn then stated that "…it's as old as it looks" and that he had "…never seen another one of these…I don't know how rare they are." Fenn continued to search the piece for a "…tag" and asked his daughter if she remembered how much he had paid for it, and asked if it was "…in the book?" Fenn's daughter stated that she was unaware but may be able to research the price. Fenn responded that he didn't know how she would find the price, if the piece was not documented "…in our inventory book." Fenn explained that he had had the dance mask in his possession for four to five years and that he believed he had paid "…twelve thousand bucks for it."

53. Fenn would not place a specific age on the dance mask, but stated that it had bailing wire attached to it with a patina. Patina is an archaeological term describing a film on the surface of metal produced by age, wear, or exposure. It can also refer to the accumulated changes in surface texture through time. Fenn went on to explain that the mask was not

22

.

important to him and that he would trade it for the atlatl and again stated that he believed

he had paid "...$12,000." Fenn also explained that the "...guy I got it from, as I recall,

was a Taos Indian...I've had it about four or five years."

54. SU 6129 then agreed to trade for the piece and Fenn confirmed the transfer by stating,

"...you can have it." Fenn then supplied packing material and a bag for transport of the

mask. Fenn then explained that he would retrieve paperwork that would confirm the piece

had come from "...private property", and SU 6129 loaded the dance mask into his/her

vehicle.

55. Fenn then met SU 6129 back in the office area of the home and provided paperwork that

indicated the atlatl was discovered on "...private property in Utah." Fenn stated that the

paperwork would help if anyone "...questions it (transaction)." SU 6129 also provided

provenience documentation for Fenn to sign. Fenn carefully read and then signed the

paperwork, indicating that the dance mask had come from "...Taos Pueblo." Fenn

explained that the terms and paperwork concerning the transaction were adequate. SU

6129 then retrieved the paperwork for evidentiary purposes and left the Fenn residence,

ending the monitoring.

J. **Archeological and cultural assessment of the dance mask**

56. A subsequent analysis of the mask by BLM archeology personnel indicated that it

represented an archaeological resource (the material remains of past human existence)

and was over 100 years of age. Also, because the archaeological context of the item is

unknown, the BLM archaeological evaluation team recommended that tribal experts evaluate the mask/ headdress to support significance and cultural affiliation.

57. A subsequent consultation with a Taos Pueblo Native American religious leader/ government tribal coordinator with knowledge of Taos Indian rituals confirmed that the dance mask was an object of cultural patrimony and a ceremonial object needed by traditional Native American religious leaders for the practice of traditional Native American religions by their present day adherents. This religious leader was provided detailed photographs of the dance mask, and noted that the object was consistent with headdresses worn during the Taos Buffalo dances, and believed the mask  to be a sacred object and inalienable by any individual tribal member.

58. On 6/1/2009 SU 6129 spoke to Fenn via telephone and confirmed that he (Fenn) still had pre historic Native American artifacts in his possession and that he (Fenn) was interested in trading or selling to SU 6129.

59. Based on the aforementioned information, my knowledge and experience, I respectfully request this honorable court to find there is probable cause to search the residence and any other outbuildings and vehicles located at the residence of #1021 Old Santa Fe Trail, Santa Fe, New Mexico, and to seize the items listed in Attachment B.

NOEL D. WAGNER,
USDOI/BLM SPECIAL AGENT

Sworn to before me and subscribed in my presence on

_08 June 09_ at _____ ALBUQUERQUE, NEW MEXICO
(date)                              (place)

U.S. MAGISTRATE/ DISTRICT COURT JUDGE
RICHARD L. PUGLISI
U.S. MAGISTRATE JUDGE

25

## **ATTACHMENT A**

The residential property, to include all outbuildings, sheds and vehicles thereon, located at:

### # 1021 Old Santa Fe Trail
### Santa Fe, New Mexico

The location is described here, and recorded below, as a large single-story, adobe-style, residence, tan in color, surrounded by an adobe wall, also tan in color. The driveway to the property is restricted by a white/grey moveable metal gate, and the entire property is covered in numerous pinon and juniper trees. The entrance to the residence is covered and the ornate wooden door has two thin windows, placed on either side of the frame.



This location can be accessed from the intersection of U.S. Interstate 25 and Old Pecos Trail and traveling north from the off ramp of exit 284 for approximately 3.1 miles until the intersection at Armenta Street. Thence travelling east (right) for approximately .2 miles, until the intersection of Camino Corrales. Thence travelling northeast (left) for approximately .1 mile until the intersection of Old Santa Fe Trail. Thence travelling southeast (right) for approximately .1 mile and the arriving at #1021 Old Santa Fe Trail. Recorded via Global Positioning Satellite (GPS) equipment, utilizing WGS (World Geodetic System) 84 datum, as **North 35 degrees, 40.229 minutes and West 105 degrees, 55.644 minutes**.



**ATTACHMENT B**

1)  All records and information as they may relate to violations of trafficking and the illegal removal of artifacts without permit or permission and/the theft/retention of stolen property and/or the  interstate transportation of stolen goods, and/or the illegal sell or trade of sacred objects and/or the  possession of  migratory birds or parts thereof, since 1940. Such records to include lists of customers and related identifying information; types, amounts, and prices of artifacts trafficked as well as dates, places, and amounts of specific transactions; any information related to the provenience of artifacts and or migratory bird parts, to include maps or Global Positioning Satellite (GPS) data; any information related to sources of illegally trafficked or obtained artifacts (including names, addresses, phone numbers, or any other identifying information); any information recording Forrest Fenn's schedule or travel from 1940 to the present; all bank records checks, credit card bills, account information and other financial records, as they may relate to the aforementioned violations.

The term "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic or magnetic form ( such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMSs, optical discs, backup tapes, printer buffers, smart cards, flash/thumb drives, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting): any mechanical form (such as printing or typing); and any photographic form ( such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, and photocopies).

2)  Any and all artifacts and or items relating to violations of 16 US.C. 470 ee (b), trafficking in illegally obtained artifacts, meaning any material remains of past human existence, over 100 years in age, removed without permit or permission from federal or tribal lands, or 18 U.S.C. 641, theft or retention of stolen government property. Technical assistance will be provided by government archeologists.

3) Any sacred objects, items of cultural patrimony, and /or associated/unassociated funerary objects as defined by 18 U.S.C. 1170, illegal trafficking in Native American Human remains or cultural items, providing that such items were purchased after the implementation of NAGPRA in 1990.

4) Any and all parts and/or portions of bald (American) or golden eagles, as defined by the Bald eagle Act of 1940 and Golden Eagle amendment of 1962 provided such items were obtained after the enactment of the law. Technical assistance will be provided by agents of the U.S. Fish and Wildlife Service.

5) Any and all parts and/or portions of migratory birds or any product  which consists or is composed in whole or in part of any such bird, as defined by the Migratory Bird Treaty Act of 1918 and subsequent treaty amendments. Technical assistance will be provided by agents of the U.S. Fish and Wildlife Service.

6) Any and all correspondence from the government of the Arab Republic of Egypt to Forrest Fenn.